# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| RALPH E. WILSON, | : | Case No. 3:16-cv-258 |
| Plaintiff, | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| NANCY A. BERRYHILL, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# DECISION AND ENTRY

## I. Introduction

Plaintiff Ralph E. Wilson brings this case challenging the Social Security Administration's denial of his application for Supplemental Security Income. He applied for benefits on September 18, 2012, asserting that he could no longer work a substantial paid job. Administrative Law Judge (ALJ) Elizabeth A. Motta concluded that he was not eligible for benefits because he is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), and the administrative record (Doc. #5).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Motta's non-disability decision.

## II. Background

Plaintiff asserts that he has been under a "disability" since July 1, 2012. He was fifty-five years old at that time and was therefore considered a person of "advanced age" under Social Security Regulations. *See* 20 C.F.R. § 416.963(e). He has a high school education. *See id.* § 416.964(b)(4).

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Motta that Dr. Rojas, his family-care doctor, prescribed medication for depression for about two years. (Doc. #5, *PageID* #s 107-08). When asked why he did not seek mental health treatment, Plaintiff responded, "Basically I tried to get in as soon as -- because I was in the hospital for 10 days about two years ago, and none of the places would take me at that time. And then finally I got into Good Samaritan Behavior Healthcare." *Id.* at 109.

Plaintiff sees Dr. Ballerene, his treating psychiatrist, once per month. *Id.* at 114. She prescribes him medication. *Id.* at 108. When asked if the medication helps, he responded, "I really haven't noticed it, that it's helping." *Id*. Plaintiff also attends counseling with Jeffrey Blommel, a therapist. *Id*. When asked if therapy helps, he stated, "I have my good days and I have my bad days with him." *Id*.

Plaintiff was admitted to the hospital towards the end of July or beginning of August 2012 after he was diagnosed with neurosyphilis, a sexually-transmitted disease

that affects his brain and nerves.  *Id.* at 112.  He has to go back to be tested every year.  *Id*.  Plaintiff testified that it causes psychological symptoms, including problems with his concentration and memory.  *Id*.  "Basically I can be thinking about one thing, and next thing you know, it just -- I'm thinking about something else afterwards, or right -- you know, during -- if I'm doing something, I'll automatically forget what I was doing."  *Id.* at 114-15.

Dr. Rojas believes Plaintiff's problems with pain are also related to neurosyphilis.  *Id.* at 113.  Plaintiff gets headaches four or five times per week that last one to two hours.  *Id*.  If he takes aspirin or ibuprofen, his headaches go away "a little bit."  *Id*.  He also gets backaches; his shoulder bothers him; and he had problems with his feet.  *Id*.

Plaintiff last worked as a catering manager.  *Id.* at 106.  He did everything—cooking, setting up the banquet rooms, and bartending.  *Id.* at 106-07.  He left because his employer stopped paying him.  *Id.* at 107.  He received unemployment for approximately six months and then "had little odds and end jobs like painting houses …."  *Id*.  Then, he "just basically lost all will to do anything."  *Id*.

Plaintiff lives in a house with his partner.  *Id.* at 105.  He does not have a driver's license.  *Id*.  Plaintiff testified that he does not like to be around other people:  "I get anxious.  I get upset.  I get angry very easy."  *Id.* at 108.  He also does not like to be out in public.  *Id*.  His partner does all the grocery shopping.  *Id*.  Plaintiff has not been in a store in about six months.  *Id.* at 109.

Plaintiff used to love to cook but does not do it very often anymore.  *Id.* at 110.  He can make a sandwich for himself and use the microwave.  *Id.* at 109-10.  "As far as in

the house, I normally let things pile up before … I literally have to force myself to do things around the house." *Id.* at 109. He is able to stand at the sink and wash dishes: "I normally force myself to." *Id.* at 110. He also mows the grass. *Id.* at 109. He explained that he has been like this for at least three years. And, "there was a point in time where I wouldn't take a shower for a couple weeks." *Id.*

On a typical day, Plaintiff watches TV and sits on his porch. *Id.* at 110. He has three cats that he takes care of. *Id.* He goes to see his brother who lives about ten minutes away "every now and then." *Id.* at 111.

### B. Medical Opinions

#### i. Ellen W. Ballerene, M.D.

Dr. Ballerene, Plaintiff's treating psychiatrist, completed a mental impairment questionnaire on August 19, 2014. *Id.* at 745-48. She indicated Plaintiff's highest Global Assessment of Functioning (GAF) score in the past year was fifty-one. *Id.* at 745. Dr. Ballerene identified the following as Plaintiff's signs and symptoms: poor memory; sleep disturbance; mood disturbances; emotional lability; recurrent panic attacks; adhedonia or pervasive loss of interests; feelings of guilt/worthlessness; difficulty thinking or concentrating; suicidal ideation or attempts; social withdrawal or isolation; decreased energy; generalized persistent anxiety; and hostility and irritability. *Id.* at 745-46.

Dr. Ballerene noted that Plaintiff's treatment has included medication and counseling with "only [a] partial response." *Id.* at 746. She opined his prognosis is fair and remarked, he "has made some improvements but [is] still limited in his activity by low energy, ongoing overwhelming anxiety, [and] poor memory [and] concentration."

4

*Id.* at 747. Additionally, his impairments or treatment would cause him to be absent from work more than three times per month. *Id.* He has a slight restriction of activities of daily living; marked difficulties in maintaining social functioning; moderate deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; and marked episodes of deterioration or decompensation in work. *Id.* at 748.

### ii. Mary Ann Jones, Ph.D.

Dr. Jones evaluated Plaintiff on October 18, 2012. *Id.* at 451-58. She diagnosed Plaintiff with dysthymic disorder and psychological factors affecting physical condition and assigned him a GAF score of fifty-one. *Id.* at 456-57. She opined that Plaintiff's intelligence fell within the borderline range, and he "would be able to understand, remember, and carry out instructions in a work setting consistent with intellectual functioning range." *Id.* at 455-57. Further, "It is likely that he is experiencing some limitations in his ability to sustain appropriate attention and concentration and to maintain adequate persistence and pace in order to perform work tasks." *Id.* at 457. Plaintiff reported to Dr. Jones that he used to cope well with stress at work but now does not. *Id.* at 458. He indicated that he is "more easily agitated and experiences more anger outbursts. *Id.* Dr. Jones concluded, "there do appear to be at least some limitations in his ability to cope with common workplace pressure." *Id.*

### iii. Bruce Goldsmith, Ph.D., & Karla Voyten, Ph.D.

Dr. Goldsmith reviewed Plaintiff's records on October 29, 2012. *Id.* at 122-33. He found that Plaintiff had five severe impairments: Neurosyphilis, major motor seizures, affective disorders, anxiety disorders, and somatoform disorders; and one non-

severe impairment: other disorders of the skin and subcutaneous tissues. *Id.* at 126. He has a mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. *Id.* at 126-27. Dr. Goldsmith opined that Plaintiff "retains the ability to complete 3-4 step tasks… without unusual production and pace demands… [and] [c]hanges should be well explained." *Id.* at 130-31.

On May 25, 2013, Dr. Voyten reviewed Plaintiff's records and affirmed Dr. Goldsmith's assessment. *Id.* at 135-47.

### III. <u>Standard of Review</u>

The Social Security Administration provides Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or

disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. The ALJ's Decision

As noted previously, it fell to ALJ Motta to evaluate the evidence connected to Plaintiff's application for benefits. She did so by considering each of the five sequential

steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 416.920. She reached the following main conclusions:

> Step 1: Plaintiff has not engaged in substantial gainful employment since September 18, 2012.
>
> Step 2: He has the severe impairments of affective (depressive) disorder and generalized anxiety disorder.
>
> Step 3: He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.
>
> Step 4: His residual functional capacity, or the most he could do despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "less than the full range of medium exertion …. He can lift as much as 50 pounds occasionally and 25 pounds frequently. Postural activities (such as climbing stairs or ramps, balancing, stooping, kneeling, crouching or crawling) can be done frequently. The claimant should not climb ropes, ladders or scaffolds. He should not be exposed to hazards such as moving or dangerous machinery or working at unprotected heights. The claimant is limited to performing simple, repetitive tasks involving low-stress duties (i.e., no strict production quotas or fast pace and only routine work with few changes in work setting). The claimant should have no more than occasional contact with the public, co-workers, and supervisors."
>
> Step 4: He is unable to perform any of his past relevant work.
>
> Step 5: He could perform a significant number of jobs that exist in the national economy.

(Doc. #5, *PageID* #s 73-88). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 87.

## V. Discussion

Plaintiff contends that the ALJ failed to properly evaluate the medical evidence. The Commissioner maintains that substantial evidence supports the ALJ's evaluation of the medical opinions of record.

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the

weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

### *Dr. Ballerene*

ALJ Motta found Dr. Ballerene's opinion to be "generally credible in most respects and entitled to significant weight." (Doc. #5, *PageID* #79). She explained, "Dr. Ballerene's assessment was, in many ways, consistent with those of Dr. Jones, Dr. Goldsmith, and Dr. Voyten except with regard to the 'marked' degree of limitation said to exist in the claimant's ability to maintain social functioning and in episodes of deterioration or decompensation." *Id.* The ALJ thus concluded that because "[a] 'marked' degree of limitation is neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record[,]" those opinions are entitled to "no weight whatsoever." *Id.* at 79-80. She similarly gave no weight to Dr. Ballerene's opinion that Plaintiff would be absent from work more than three times per month. *Id.* at 80.

ALJ Motta provided several reasons for her findings. She first broadly addressed Dr. Ballerene's opinions, finding, "Dr. Ballerene's own treatment records do not substantiate "marked" limitation in any relevant area of consideration." *Id.* (citing Ex. 12F [*PageID* #s 749-56]). For example, the ALJ notes that Dr. Ballerene diagnosed Plaintiff with major depressive disorder, single episode, *in partial remission* and

10

generalized anxiety disorder. *Id.* at 80. Further, Dr. Ballerene indicated in both her opinion and her treatment notes that Plaintiff's symptoms improved with medication. *Id.*

Plaintiff counters that the ALJ erred in finding Plaintiff's mental health records showed improvement with medication. He reasons, "mental health symptoms inevitably wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances, it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." (Doc. #7, *PageID* #824) (citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001)). Plaintiff also argues, "Significantly, ALJ Motta failed to consider the evidence indicating Wilson's ongoing severe mental health symptoms even with different medications and treatment." *Id.* at 825. For example, "In April 2014, treatment notes show that Wilson was having outbursts on a daily basis and experiencing symptoms of depression and anxiety including suicidal ideation, lack of interest in life, and uncontrollable worry and irritability. *Id.* (citing Doc. #5, *PageID* #669).

Although Plaintiff is able to point to some specific examples of his ongoing mental health symptoms, "[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). "[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). In

11

the present case, substantial evidence supports the ALJ's finding that Dr. Ballerene's opinions concerning Plaintiff's marked limitations are not consistent with the treating notes of record.

The ALJ is correct that Dr. Ballerene's August 2014 assessment rated Plaintiff's prognosis as "fair" and recognized he "has made some improvements …." (Doc. #5, *PageID* #747). She also accurately acknowledged that despite these improvements, Plaintiff still experiences symptoms such as low energy, overwhelming anxiety, poor memory and concentration, and mood disturbances. *Id.* The ALJ is likewise correct that Dr. Ballerene's treatment notes document improvement. For example, in September 2014, Dr. Ballerene noted that Plaintiff's sleep was "a bit better" and he was sleeping more. *Id.* at 768. Further observations indicated improvement: "Moods not too bad, still has episodes that gets down, [but] not happening as often, not as upset over [little] things. [P]artner has [noticed] a change and says he is not getting as angry as fast. Lamictal & zoltot [seemed] to help. [N]o SEs [side effects] to them. ... Still some [anxiety], ·but not like it [was]. A [little] more relaxed and easy [going]. [Concentration] a [little] better, but still issues with memory. Energy level is getting better, doing a few more things around the house, still not where [he] wants to be or used to be, but getting there." *Id.*

Plaintiff's therapist's records also show some improvement. For example, in July 2014, Mr. Blommel noted that he and Plaintiff discussed his "improvement, [and] getting out of the house and going to the busy flea market with [his partner]. He stated that he was a little uneasy, but was able to maintain his presence, although he was not as

12

engaged in shopping as [his partner]." *Id.* at 693. In September 2014, he noted that Plaintiff "stated that he has been sleeping better and longer, and that the improved sleeping pattern help[s] him 'feel calmer in the morning … feel better during the day.' He also stated that he is spending more time out of his house, sitting on the front porch, walking around the block, and going shopping with his partner." *Id.* at 777. And, he indicated in November 2014, Plaintiff "stated that he has been feeling really good lately and believes his medication have had a positive influence in his improved behavior. … [He] also stated that he was able to 'reconnect with an old friend I have not seen for years', and he really enjoyed the company and plans to continue the relationship. He also stated that his partner has been encouraging him to get his driver's license back, so [he] can 'get out of the house and get active during the day' when his partner is at work." *Id.* at 806.

ALJ Motta also observed that Dr. Ballerene and Dr. Jones assigned Plaintiff a GAF score of 51—indicating moderate symptoms. *Id.* at 80. Plaintiff asserts that the ALJ's reliance on his moderate GAF scores is misplaced. (Doc. #7, *PageID* #823). He notes that a GAF score of 51 indicates moderate symptoms, but it "is on the low borderline end of moderate to severe symptoms." *Id.* "In fact, a GAF score of 50 reflects serious symptoms or serious difficulty in social, occupational, or school functioning …." *Id.* at 823-24 (citation omitted). Plaintiff is correct that his GAF scores are very close to "serious" symptoms. But, notably, Dr. Ballerene assigned slightly higher GAF scores throughout her treatment of Plaintiff. For example, on

13

September 23, 2014, she assigned a GAF score of 52, and on October 21, 2014, she assigned a GAF score of 53. (Doc. #5, *PageID* #s 772, 796).

There are significant problems associated with GAF scores. Indeed, the fifth and most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) no longer uses the GAF scale, in part due to "its lack of conceptual clarity (*i.e.,* including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." Liza H. Gold, *DSM-5 and the Assessment of Functioning: The World Health Organization Disability Assessment Schedule 2.0,* 42 J. AM. ACAD. PSYCHIATRY & LAW 173, 174 (2014) (footnote omitted) (*available at* http://www.jaapl.org. Search by article title). Further, "the Commissioner 'has declined to endorse the [Global Assessment Functioning] score for 'use in the Social Security and [Supplemental Security Income] disability programs,' and has indicated that [Global Assessment Functioning] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"" *DeBoard v. Comm'r of Soc. Sec.,* 211 F. App'x 411, 415 (6th Cir. 2006) (quoting *Wind v. Barnhart,* 133 F. App'x 684, 692 (11th Cir. 2005); 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)). Given the evidence in this case, a GAF score of 51 does not elucidate the severity of Plaintiff's mental health conditions. *See Oliver v. Comm'r of Soc. Sec.,* 415 F. App'x 681, 684 (6th Cir. 2011) ("A GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues.") (citing *White v. Comm'r of Soc. Sec.,* 581 F.3d 272, 276 (6th Cir. 2009); 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)).

ALJ Motta provided some specific reasons for discounting each of Dr. Ballerene's remaining opinions. Looking first at social functioning, the ALJ noted that both Dr. Jones and Dr. Ballerene described Plaintiff as cooperative. (Doc. #5, *PageID* #80). Plaintiff also "told Dr. Jones that he 'interacted quite well with his coworkers and supervisors when he was employed' [and] … he 'did very well with difficult clients' [in his former catering work]." *Id.* (citing Ex. 3F at 8 [*PageID* #457]). Additionally, Plaintiff gets "along adequately with his partner and he occasionally visits his brother." *Id.* Further, there is no evidence of him being rude, aggressive, or violent towards others. *Id.*

The ALJ, however, acknowledges that Plaintiff "did become embroiled in a pay dispute with his last employer… [and he] testified that he does not like to be around other people and that he prefers to remain at home." *Id.* (citation omitted). She likewise observes that the State agency record-reviewing psychologists, Dr. Voyten and Dr. Goldsmith, opined Plaintiff only had a mild limitation in social functioning. However, based on Plaintiff's allegation of social withdrawal, ALJ Motta found their opinion "to be an underestimate of the claimant's actual degree of limitation …." *Id.* Together, this constitutes substantial evidence supporting ALJ Motta's rejection of Dr. Ballerene's opinion on Plaintiff's social functioning.

Turning to Dr. Ballerene's opinion that Plaintiff experiences marked episodes of deterioration or decompensation at work, the ALJ accurately observed that Dr. Ballerene provided "no explanation as to what exactly that meant." *Id.* at 81; *see* 20 C.F.R. § 416.927(c)(3) ("The better an explanation a source provides for a medical opinion, the

15

more weight we will give that medical opinion."). Additionally, the ALJ emphasized, "There is no evidence of episodes of decompensation each of extended duration[:]"

> There was only one relatively recent episode of manic behavior in 2012 (and/or seizure as he had an emotional reaction to finding out the diagnosis of neurosyphilis) that could be characterized as an episode of decompensation and that particular episode was clearly not of extended duration. The claimant's symptoms were quickly and effectively treated and he was discharged from treatment in a much-improved condition (characterized by a GAF score of "70"). … The evidence does not document the existence of a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate. The evidence does not document a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

(Doc. #5, *PageID* #81); *see* 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").

Finally, ALJ Motta also gave less weight to Dr. Ballerene's opinion that Plaintiff would be absent from work more than three times per month due to his impairment or treatment. She found that it "cannot be credited" because it "is purely speculative and lacks any logical medically determinable foundation in the record." (Doc. #5, *PageID* #80). And, she noted, as discussed in more detail above, Plaintiff's symptoms have responded to treatment. *Id.*

Plaintiff contends that Dr. Jones' opinion that he would have some limitations in his ability to cope with workplace pressure is "not inconsistent" with Dr. Ballerene's

16

opinion that he would miss more than three days of work per month. (Doc. #7, *PageID* #822). It is not clear how these two opinions are related. Dr. Ballerene opined that Plaintiff's impairments or treatment would cause him to be absent from work more than three times per month. (Doc. #5, *PageID* #747). Plaintiff is correct that Dr. Jones' opinion that "there do appear to be at least some limitations in his ability to cope with common workplace pressure" is "not inconsistent" with Dr. Ballerene opinion—but it is also not consistent with or supportive of her opinion.

Plaintiff, moreover, does not point to any other evidence that supports Dr. Ballerene's opinion that Plaintiff would be absent from work more than three times per month. Given the lack of support in the record, it was reasonable for the ALJ to discount Dr. Ballerene's opinion.

ALJ Motta provides one additional reason for discounting Dr. Ballerene's opinion. She accurately observed that Dr. Ballerene began treating Plaintiff in June 2014—two months before she provided her opinion—and the day she completed her opinion was only her third appointment with him. *Id.* at 79, 749. She only saw him two times after that date. *Id.* at 767, 791. These observations reasonably support the ALJ's decision to discount Dr. Ballerene's opinion. *See* 20 C.F.R. § 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

The court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standard and whether the ALJ's decision is supported by substantial evidence. *Gayheart,* 710 F.3d at 374. In the present case, ALJ Motta applied

the correct legal standards to determine that three of Dr. Ballerene's opinions are not entitled to weight. The ALJ's decision is supported by substantial evidence.

*Dr. Jones*

Plaintiff also contends that the ALJ failed to evaluate and assign weight to Dr. Jones's opinion. (Doc. #7, *PageID* #820). The ALJ did, however, assign "great weight" to Dr. Jones' opinion concerning Plaintiff's ability to maintain concentration, persistence, and pace. (Doc. #5, *PageID* #81) ("The opinions of the above-referenced mental health professionals in that regard are given great weight."). Plaintiff is correct that the ALJ failed to specifically assign weight to Dr. Jones's other opinions.

Under the Regulations, "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant…." 20 C.F.R. § 416.927(e)(2)(ii); *see* Soc. Sec. R. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996). When considering the opinions of nontreating sources, ALJs use the same factors applicable to weighing treating source opinions—the examining relationship, supportability, consistency, specialization, and other factors such as the source's understanding of disability programs. 20 C.F.R. § 416.927(a)-(d).

The Commissioner asserts, "Plaintiff fails to show reversible error …. Simply put, Plaintiff fails to show how Dr. Jones' opined limitations were inconsistent with the ALJ's RFC limiting Plaintiff to simple, repetitive tasks involving low-stress duties …." (Doc. #10, *PageID* #848). This argument is well taken. Because the ALJ accommodated all of Dr. Jones' limitations, the ALJ's failure to assign weight to each opinion and address

18

every factor constitutes harmless error. *See Wilson*, 378 F.3d at 547-48 ("Despite his failure to address the treating physician's opinion, the ALJ in *Heston* had considered the limitations described by that physician …. There was no reason to remand the case because, wittingly or not, the ALJ attributed to the claimant limitations consistent with those identified by the treating physician.") (discussing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528 (6th Cir. 2001)).

Accordingly, for the above reasons, Plaintiff's Statement of Errors lacks merit.

**IT IS THEREFORE ORDERED THAT**:

1. The ALJ's non-disability decision is affirmed; and

2. The case is terminated on the Court's docket.

Date:  September 8, 2017               *s/Sharon L. Ovington*
                                        Sharon L. Ovington
                                        United States Magistrate Judge